UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICE SADOWSKI, | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 12-2083 |
| v. | : | |
| | | OPINION |
| GLOUCESTER TOWNSHIP, et al., | : | |
| Defendants. | : | |

This matter is before the Court on motion of Defendants Ernest Basile, David Belcher, John Bullock, Gloucester Township, Gloucester Township Police Department, Joseph Kaighn, Timothy Kohlmeyer, Thomas Ritz, and John Stollsteimer [37] for summary judgment under Federal Rule of Civil Procedure 56. The Court has considered the written submissions of the parties and the arguments advanced during the hearing in this matter on May 5, 2014.  For the reasons expressed on the record that day, and those that follow, Defendants' Motion for Summary Judgment is denied in part.

## I.  Jurisdiction

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331.  Plaintiff Patrice Sadowski asserts a violation of her civil rights pursuant to 42 U.S.C. § 1983. In addition, the preamble of the Complaint states that the matter is being brought under the Civil Rights Act of 1871,  and 42 U.S.C. §§

1

1983, 1985, 1986 and 1988.[1]  However, the Complaint contains one count alleging violations of 42 U.S.C. § 1983 in the form of (1)Unlawful/False Seizure/Arrest and (2) Excessive Force. There is reference to a <u>Monell</u> claim in the Complaint. With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## II. Background

This case is related to <u>Ronald Hartman v. Gloucester Twp., et al.</u>, Civil Action Number 12-2085, which is currently pending before this Court.  Plaintiff Patrice Sadowski ("Sadowski") and Ronald Hartman ('Hartman") were working from Hartman's home on April 9, 2010.  Both were employees of the United States Department of the Treasury in the Internal Revenue Service Division and were permitted to telecommute, i.e., perform their job duties from a location outside the office.  Hartman resides in Gloucester Township, New Jersey.

On April 9, 2010, the Gloucester Township Police claim that a 911 call was generated from the Hartman Residence and that the caller "hung up."  This type of 911 call is also referred to as an "abandoned" 911 call.  The Township's protocol requires that a police officer be dispatched to the residence to investigate whether the call was made in error or by someone in need. As a result, Gloucester Township Police Officer David Belcher ("Belcher") went to the Hartman residence and knocked on the door.

What happens next is in dispute.  The version of events recounted by both Sadowski and Hartman differ from Belcher's version, and later on, from the version of

---

[1] The Motion for Summary Judgment does not address Plaintiff's claims under **42 U.S.C. §§ 1985, 1986 and**

events recounted by the other responding officers.  In general terms, Officer Belcher claims that when he responded to the Hartman residence, Hartman acted suspiciously, would not let him enter the house, gave vague answers to his investigatory questions, and insisted that Belcher obtain a warrant to enter the house.  Because an abandoned 911 call was generated from Hartman's residence, Belcher contends that he was trying to ascertain whether the call came from someone in need inside of the residence.  After he met Hartman, he claims the circumstances were suspicious and called for backup out of concern that something was wrong.  Eventually, the police entered the house and arrested Hartman—as detailed in the Court's Opinion in <u>Ronald Hartman v. Gloucester Twp., et al.</u>, Civil Action Number 12-2085.  The eventual arrest of Hartman is not relevant to the matter at hand.  However, the events leading up to Hartman's arrest are germane to Sadowski's case and are recounted here. On summary judgment, the facts are reviewed in a light most favorable to Plaintiff, here Sadowski.  From that perspective, the facts of her case are as follows.

Hartman and Sadowski were working in separate areas of the house on the morning of April 9, 2010.  They were alone and both deny placing a 911 call, errantly or for any need of assistance.  Sadowski Dep. at 29:6-8; Hartman Dep. at 45:2-4. Belcher arrived at the Hartman residence and agrees that, from the outside of the house, he did not see or hear any signs of distress or anything indicating an emergency.  Belcher Dep. at 24:22-22:4.  Belcher knocked on the front door and Hartman answered.[2] Importantly, Sadowski testifies that she accompanied Hartman to the front door to

---

1988.  As a result, the Court these claims are not addressed herein.

[2] Hartman's front door has an outside lock and an interior lock; both must be opened with a key.  Therefore, when Hartman answered the door, he had to use a key from the inside to unlock the door.

3

speak with Belcher. Sadowski Dep. 31:9-13.  Hartman also testified that Sadowski accompanied him to the door.  Hartman Dep. at 50:16-19, 51:9-22.

According to both Sadowski and Hartman, the door was open and Belcher had an unobstructed view of both Hartman and Sadowski.[3] They assured Belcher that all was well and that they did not call 911. Sadowski Dep. at 35:12-36:1; Hartman Dep. at 50:20-51:8.  Belcher was speaking in a raised voice and demanding to enter the home. Sadowski Dep. at 31:17-21, 32:23-32:7; Hartman Dep. at 51:23-52:7, 52:15-20, 52:8-23. Both Sadowski and Hartman characterize Belcher as belligerent and claim that he screamed at them, saying multiple times that he can enter any house anytime.  Id.

Belcher then asked Hartman for identification, and Hartman went upstairs to get his federal identification and his wallet.  Hartman Dep. at 55:19-23, 56:8-57:10, 54:24-55:10.  In the meantime, Sadowski and Belcher spoke at the door.  Sadowski claims that Belcher requested entry and stated that he needed to check the house for dead bodies. Sadowski Dep. at 34:12-16.  As Hartman was coming back to the door, Sadowski claims that Belcher said "well, okay then" and walked away.  Sadowski Dep. at 34:24-35:11.  At this point Sadowski believed Belcher was gone and the "incident" was over; she and Hartman resumed working. Id. at 38:1-17; Hartman Dep. at 58:23-59:7.

Approximately ten minutes later, the residence telephone rang and was answered by Sadowski.  Sadowski Dep. at 39:17-40:2; Hartman Dep. at 60:11-22.  It was a Gloucester Township Police Officer asking Sadowski to come outside with her keys. Sadowski Dep. at 40:4-9. Sadowski exited the residence through the back sliding glass

---

[3] Belcher testifies that only Hartman answered the door, and opened the door approximately 2-4 inches. Belcher Dep. at 28:16-20.  According to Belcher, he asked if anyone else was home and Hartman told him it was none of Belcher's business. Id. at 31:1-7.

doors and claims that, as she proceeded to the front of the house, she was met by Gloucester Township Police Officer John Stollsteimer ("Stollsteimer") in "full assault stance" with his weapon drawn and pointed at Sadowski's face.  Sadowski Dep. at 40:14-19, 42:24-43:6.  Sadowski claims that the weapon was pointed at her for almost fifteen seconds. Id. at 76:7-77:12. Sadowski, who was confused, said "what in God's name are you doing?"  Id. at 41:7-11.  Stollsteimer laughed and said "yeah, right, what am I doing." Id. at 41:13-14.  Sadowski was then escorted to the front of the house where she encountered another police officer and Belcher.  Id.

By this time there were several officers on the scene.  Sadowski was "peppered with questions" about who else was in the house, who owned the cars in the driveway, who they worked for, what they were doing, etc. Id.  Sadowski answered their questions and assured them that there were no weapons in the house and that nothing was wrong. Id. at 41:15-42, 42:3-10.  At this point, the record is unclear as to the nature of the officers' concern.  If domestic violence was suspected, Sadowski was now safely out of the house.

Defendants claim that after Sadowski exited the house, she told them that Hartman was acting strange and that Hartman's wellbeing was now at issue.  However, Sadowski denies making such a statement.  Although you can hear an officer on the audio telling dispatch that Sadowski said Hartman was irrational, you never hear Sadowski's voice on the audio.  Def. Exs. L and O (dispatch call and transcript). Throughout her interaction with the police, Sadowski claims that she told them repeatedly that nothing was wrong, that there were no weapons in the house, and that it was unnecessary for the officers to enter the house. Id. at 43:6-16, 46:17-23.

5

Then the Officers asked Sadowski if she had a key to the residence and she replied yes; the large key ring was hanging by her side.  She claims that one of the officers took the keys to Hartman's residence without her consent and directed her to stand in one spot. Id. at 46:24-47.  She was prohibited from approaching the door to coax Hartman outside; she claims Hartman would have come at her insistence. Sadowski describes being told to stand "right there" and that she was surrounded by the police officers.  Id. at 80:17-81:9.  She claims that she was not free to leave.  Despite her protests ("What in God's name are you doing"), she claims the officers were laughing and acting cavalier.  In total, she estimates being "detained" at the direction of the officers for almost 45 minutes; this time includes prior to, during, and after the eventual arrest of Hartman. Id. at 81-82.

Sadowski claims she was seized in violation of the Fourth Amendment because she felt that she was not free to leave.  Her excessive force claim is related to the show of force by Stollsteimer in "assault stance."  Her illegal seizure claim relates to the excessive force exhibited by Stollsteimer and the detainment by the other officers as they attempted to gain entry into Hartman's home.  She argues that there is no reasonable suspicion, as required by Terry or probable cause for the length of the seizure.  For the reasons that follow, Defendants' motion for summary judgment is denied in part.

## III. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party

6

is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.

<u>Andersen</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); <u>accord</u> Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the fact finder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.  Discussion

### A. 42 U.S.C. § 1983

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  <u>See</u>

Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42

U.S.C. § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.  As the above language makes clear, Section 1983 is a remedial

statute designed to redress deprivations of rights secured by the Constitution and its

subordinate federal laws.  See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  By its

own words, therefore, Section 1983 "does not . . . create substantive rights."  Kaucher v.

County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

       To state a cognizable claim under Section 1983, a plaintiff must allege a

"deprivation of a constitutional right and that the constitutional deprivation was caused

by a person acting under the color of state law."  Phillips v. County of Allegheny, 515

F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir.

1996)).  Thus, a plaintiff must demonstrate two essential elements to maintain a claim

under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the

Constitution or the laws of the United States" and (2) that plaintiff was deprived of her

rights by a person acting under the color of state law.  Williams v. Borough of West

Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

       A similar analysis may be made regarding any claim under the New Jersey Civil

Rights Act.  See Armstrong v. Sherman, No. 09-716 (AET), 2010 WL 2483911, *5 (D.N.J.

Jun. 4, 2010) ("[T]he language of the New Jersey Civil Rights Act, like the language of

42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.").

## B. Municipal Liability

A municipality is not liable under 42 U.S.C. § 1983 on a respondeat superior theory.  Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978).  However, a government entity may be liable for its agent's actions upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights.  Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).  Further, a plaintiff must show that the municipality acted with "deliberate indifference" to the known policy or custom.  Canton v. Harris, 489 U.S. 378, 388 (1989).  "A showing of simple or even heightened negligence will not suffice."  Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. at 397, 407 (1997).

Further, the United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  As such, an employee of the state named as a defendant in a civil rights action may be held liable only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity.  See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities,

10

are 'persons' within the meaning of § 1983").

## C. Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be

11

sufficiently clear that a reasonable official would understand that what he is doing

violates that right." <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001) (quoting <u>Anderson v.</u>

<u>Creighton</u>, 483 U.S. 635, 640 (1987)).  That is, "[t]he relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."

<u>Couden v. Duffy</u>, 446 F.3d 483, 492 (2006).  "If the officer's mistake as to what the law

requires is reasonable," the officer is entitled to qualified immunity.  <u>Couden</u>, 446 F.3d

at 492 (internal citations omitted).  Further, "[i]f officers of reasonable competence

could disagree on th[e] issue, immunity should be recognized." <u>Malley v. Briggs</u>, 475

U.S. 335, 341 (1986).  <u>See also</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (The

general touchstone is whether the conduct of the official was reasonable at the time it

occurred.).  Finally, because qualified immunity is an affirmative defense, the burden of

proving its applicability rests with the defendant.  <u>See</u> <u>Beers-Capital v. Whetzel</u>, 256

F.3d 120, 142, n.15 (3d Cir. 2001).

## D. Fourth Amendment

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers and
effects, against unreasonable searches and seizures, shall not be violated,
and no Warrants shall issue, but upon probable cause, supported by Oath
or affirmation, and particularly describing the place to be searched, and
persons or things to be seized.

The Supreme Court explicitly has held "that a warrant to search for contraband

founded on probable cause implicitly carries with it the limited authority to detain the

occupants of the premises while a proper search is conducted." <u>Id.</u> at 705.  Further,

'[i]nherent in <u>Summers</u>' authorization to detain an occupant of the place to be searched

12

is the authority to use reasonable force to effectuate the detention." <u>Muehler v. Mena</u>, 544 U.S. 93, 98-99 (2005).  As part of the search, "[p]olice may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection." <u>United States v. Bennett</u>, 329 F.3d 769, 774 (10th Cir. 2003). <u>See</u> <u>also</u> <u>Muehler</u>, 544 U.S. at 99 (concluding that the 2– to 3–hour detention in handcuffs of an occupant of the address on a search warrant who was not suspected of any wrongdoing was reasonable because such a "marginal intrusion" did not outweigh the government's continuing safety interests); <u>Torres v. United States</u>, 200 F.3d 179 (3d Cir. 1999) (finding it lawful that, in executing warrant to search for narcotics, agents entered premises with guns drawn and pointed at the occupants).

A Fourth Amendment excessive force claim calls for an evaluation of whether police officers' actions are objectively reasonable in light of the facts and circumstances confronting him. <u>Graham v. Conner</u>, 490 U.S. 386, 397 (1989).  While the question of reasonableness is objective, the court may consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. <u>Id.</u>  In a claim for excessive force, "the central question is 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)).

Furthermore, appropriate attention should be given "to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Graham</u>, 490 U.S. at

396).  See also Graham, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary," violates the constitution.).

## V.   Analysis

First, a Municipal Police Department is not a proper defendant in a case under 42 U.S.C. § 1983. Padilla v. Township of Cherry Hill, 110 Fed. App'x. 272, 278 (3d Cir. 2004). As a result, Defendant Gloucester Township Police Department is dismissed from the action.

Next, there are two issues not in dispute.  First, there is no dispute that the officers were acting under the color of law. See Phillips, 515 F.3d at 235. Second, in terms of the qualified immunity analysis, there is no dispute that the Fourth Amendment Right to be free from unreasonable seizures was clearly established on April 9, 2010.  In terms of Sadowski's claims under §1983 and whether the Officers are entitled to qualified immunity, there is dispute as to whether the facts show that the officers' conduct violated the Fourth Amendment and, if so, whether the officers' mistake as to the law was reasonable under the circumstances.  Since the two issues are related, they will be addressed jointly.

The Court finds that there are questions of fact as to whether Sadowski was seized in violation of the Fourth Amendment and whether the officers' conduct was reasonable. Although qualified immunity is a question of law, the presence of disputed issues of material fact precludes summary judgment. Id. Such a circumstance is present here. Therefore, qualified immunity as to the seizure claim is denied.

**A. Sadowski's Seizure Claim**

14

Defendants' argue that Sadowski was free to leave at any time and that the officers had a reasonable belief that their actions were legal.

A seizure occurs under the Fourth Amendment when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19–20 n. 16 (1968). The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person" in light of the circumstances. California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (citing United States v. Mendenhall, 446 U.S. 544, 554(1980)).   There are several factors to consider:

> [1] the threatening presence of several officers, [2] the display of a weapon by an officer, [3] some physical touching of the person of the citizen, or [4] the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

Mendenhall, 446 U.S. at 554–55 (internal citations omitted).

Viewing the facts in a light most favorable to Sadowski, her interaction with Belcher at the front door assured him that she was fine and that the 911 call was not made by anyone in the residence.  Then, she was solicited to come outside by the police. Belcher denies that the police solicited her to come out and claims that her exit was a complete surprise to them. Belcher Dep. at 84.  Regardless, it is unclear whether she was asked to come outside because the police believed she was in danger or because they feared for Hartman's safety.

Belcher testifies that he made the decision to enter the house when Hartman refused to let him in without a warrant and then slammed the door.  Belcher Dep. at 73.  Hartman and Sadowski deny that they slammed the door.  Importantly, Belcher did not have a warrant and Belcher thought it was suspicious that Hartman insisted that Belcher obtain a warrant. Id.  Belcher claims that he called for backup and tried to listen to the occupants inside the house, but he denies hearing anything when he pressed his ear to the house. Belcher Dep. 68:6-11. Nonetheless, Sadowski exits because the police asked her to come outside; upon exit she is faced with a firearm pointed at her.  There is no indication that Belcher believed that Sadowski was involved in any criminal activity inside the house.  It is unclear whether Belcher believed that any criminal activity was afoot before Sadowski exits the house.  Belcher claims that once she was out of the house, the situation became a possible domestic dispute.  Belcher Dep. at 94.  If that is the case, then when Sadowski exits, she is no longer in danger from Hartman because she is outside of the house.  Sadowski, however, is questioned, surrounded by multiple officers, and told to stay put.  The officers physically take keys from her hand.  The totality of the conducts may violate the Fourth Amendment. See James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012) (Fourth Amendment violated where person is detained "by means intentionally applied to terminate [her] freedom of movement.").  Sadowski's account, confirmed by Hartman, is enough to permit a claim of illegal seizure in violation of the Fourth Amendment.

Because the Court cannot ascertain what the surrounding circumstances were, given the disparate accounts from the officers and Sadowski— and Hartman—it is unable to extend the doctrine of qualified immunity to the officers as to Sadowski's

16

claim of illegal seizure. Plaintiff points to sufficient evidence that the actions of the Defendants were not objectively reasonable in light of the facts and circumstances confronting them.  Viewing all of the circumstances surrounding the incident in a light most favorable to Sadowski, a "reasonable person would have believed that she was not free to leave." Id. at 554, 100 S.Ct. 1870.  Thus, it is possible that Sadowski's Fourth Amendment rights were violated.  Given the factual dispute, the Court cannot extend qualified immunity at this time.

### B. Whether Stollsteimer Used Excessive Force

Likewise, the factual dispute as to the circumstances surrounding the use of force employed by Stollsteimer cannot be ascertained so as to extend qualified immunity to Stollsteimer. In short, Defendants contend that the weapon was drawn for the officer's safety and for a very short period of time (less than a minute) because they did not expect anyone to exit the house from the back and did not know whether the Plaintiffs had access to weapons in the home.  They argue reasonableness under the suspicious circumstances.

Here, there is a significant dispute as to the facts surrounding the circumstances of this case.  Defendants fail to identify with any certainty the alleged crime at issue or, viewing the facts in a light most favorable to Plaintiff, any circumstance that would necessitate a show of force.  As a result, there are genuine issues of material fact precluding summary judgment as to Sadowski's excessive force claim and Defendants' claim of qualified immunity.

### C. Plaintiff's Monell Claim

As outlined above, a municipality is not liable under 42 U.S.C. § 1983 on a

*respondeat superior* theory.  Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978).  Sadowski has failed to prove the existence of any official policies or customs that may have caused her constitutional violation in this case.  See, e.g., McTernan v. City of York, Pa., 564 F.3d 636 (3d Cir. 2009) ("[A plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was.").  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Connick v. Thompson, –– U.S. ––, 131 S.Ct. 1359 (2011).  Even if the officers' actions were unconstitutional, this single incident likely would not demonstrate a need for training so obvious as to give rise to a failure to train claim under § 1983.  See Connick, 131 S.Ct. at 1360 (stating that "single-incident liability" applies only in "narrow range of circumstances" where "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations" (quotations and citations omitted)).

Sadowski does not oppose summary judgment in her brief as to her Monell claim. Although her Statement of Material and Disputed Facts contains a section entitled "The Gloucester Township Police Department maintains an unconstitutional policy with respect to entering into a person's home when there has been an accidental or abandoned 911 call and has failed to train its officers properly on this policy," Sadowski does not connect the policy to her injuries.  Moreover, the Statement of Material Facts is not a place for legal argument.  Globespanvirata v. Texas Instrument, 2005 U.S. Dist. LEXIS 27820 (D.N.J. Nov. 15 2005).  As a result, summary judgment is granted as

18

Defendant Gloucester Township.

## VI. Conclusion

For the reasons set forth here, summary judgment is denied in part.  Summary judgment is granted as to Defendants Gloucester Township and Gloucester Township Police Department.  Summary judgment is denied as to Defendants Ernest Basile, David Belcher, John Bullock, Joseph Kaighn, Timothy Kohlmeyer, Thomas Ritz, and John Stollsteimer.

An appropriate Order shall issue.


Dated: June 19, 2014

s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge

19